## Walters, Appellant, *v.* Ditzler.

446

Argued November 22, 1966.   Before Bell, C.J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*John Milton Ranck,* with him *Charles Foltz Herr,* and *Appel, Ranck, Herr & Appel,* for appellants.

*John R. Gibbel,* with him *Bernard M. Zimmerman,* and *Zimmerman, Zimmerman, Myers & Gibbel,* for appellee.

OPINION BY MR. JUSTICE JONES, March 14, 1967:

On July 2, 1958, Daniel J. Walters, aged four years, while traversing a highway located upon a bridge near Brickerville, Lancaster County, was struck by a motor vehicle operated by A. F. Ditzler and sustained very serious personal injuries.

Following the accident, Ditzler told William Walters, the child's father, that he was insured by Harleysville Insurance Company and that he was sure the insurance company would take care of it "because that's what [I] pay premiums for". Six weeks after the accident—when the child was in a condition of complete physical helplessness—an adjuster called at Walters' home. Certain nursing bills were discussed and were turned over to the adjuster by the Walters; the adjuster then told Walters that the insurance company did not pay bills "piecemeal", that it would have to be a "lump sum settlement", that by reason of the child's minority, any settlement would have to be

approved by the court and that no settlement could be made until the child was "rehabilitated". Two days later, the adjuster returned the nursing bills to the Walters. *Until April 17, 1961—two years and nine months after the accident—there was no further contact between the insurance carrier or its adjuster and the Walters.*

On April 17, 1961, Mrs. Walters wrote a letter to the insurance company stating, inter alia: "We would like to make settlement at this time". Eleven days later, the insurance company wrote to the Walters stating, inter alia: "We have reviewed our file in regard to this matter, and find that the Pennsylvania Statute[1] has expired and we will be unable to be of any service to you."[2]

Fourteen months later—and three years and eleven months after the date of the accident—the present trespass action was instituted in the Court of Common Pleas of Lancaster County against Ditzler. When Walters filed their complaint, Ditzler, acting through his insurance carrier, filed an answer containing new matter which raised the defense of the statute of limitations to which new matter Walters filed a reply alleging Ditzler was estopped to raise the defense of the statute by reason of the conduct of the insurance company adjuster when he visited the Walters' home on August 16, 1958. Ditzler filed a motion for judgment on the pleadings which was dismissed. Walters then filed an amended reply wherein the allegations

---

[1] Act of June 24, 1895, P. L. 236, §2, 12 P.S. §34 which provides a two year period within which to institute a suit for the recovery of damages for personal injuries.

[2] The factual version of the events which transpired is viewed in the light most favorable to the child and his parents, such factual version having been developed at a hearing in the court below to determine whether an estoppel barred the defense of the statute.

as to the adjuster's alleged fraudulent and misleading conduct were particularized and wherein there was an additional allegation that, by reason of the minority and incompetency of the child, the bar of the statute was tolled. After a hearing, the court below entered judgment in favor of Ditzler and against Walters. From that judgment the instant appeal was taken.

As presented by Walters' counsel, the issue presented is: where an insurance adjuster stated that the insurance company will not pay bills "piecemeal", that until the child is "rehabilitated" there cannot be a settlement and that the insurance company would only make a "lump sum settlement", subject to court approval because of the child's minority, and where the parents of the child were thus led to believe that the insurance company would pay the claim, was the adjuster's conduct of such fraudulent, misleading and deceptive nature as to estop Ditzler from raising the defense of the statute of limitations?

Presently pertinent are certain well settled legal principles: (a) mere mistake, misunderstanding or lack of knowledge do not toll the running of the statute of limitations: *Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A. 2d 267 (1963), and authorities therein cited; (b) if, through fraud, deception or concealment of facts, an insurance company lulls an injured person or his representatives into a sense of security so that such person's vigilance is relaxed, then the company is estopped from evoking the statute: *Schaffer v. Larzelere,* supra, p. 405, and authorities therein cited; (c) the fraud which will toll the statute and effect an estoppel need not be fraud in the strictest sense, i.e., inclusive of an intent to deceive, but may be fraud in the broad sense, i.e., inclusive of an unintentional deception: *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 96, 204 A. 2d 473 (1964) ; *Schwab v. Cornell,* 306 Pa. 536, 539, 160 A. 449 (1932) ; (d) an estoppel becomes operative only

in *clear* cases of fraud, deception or concealment: *Bonfitto v. Bonfitto,* 10 Pa. D. & C. 2d 598, aff'd 391 Pa. 187, 137 A. 2d 277 (1958); *Gunn v. Washek,* 109 P.L.J. 286, aff'd 405 Pa. 521, 176 A. 2d 635 (1961); (e) the statute of limitations will run against persons under a disability, including minors and incompetents: *Walker v. Mummert,* 394 Pa. 146, 146 A. 2d 289 (1958);[3] *Von Colln v. Penna. R.R. Co.,* 367 Pa. 232, 80 A. 2d 83 (1951).

Applying these principles to the instant factual situation, it is evident that the doctrine of estoppel cannot be successfully invoked and that the running of the statute of limitations has not been tolled. We agree with the court below: "According to the facts as found by the court from the testimony, [Walters] have not met the burden of proving by clear, precise and convincing evidence the existence of such fraud or concealment as would estop [Ditzler and his insurance carrier] from pleading the Statute of Limitations. There is no factual dispute that the negotiations were merely toward an amicable settlement. The nursing bills . . . were discussed and given to . . . the adjuster, who returned them to [Walters] on August 18, 1958 and there is no evidence that other accrued bills were sent to [Ditzler's] insurance carrier or its adjuster, . . ., nor is there any evidence that [Ditzler] or his insurance carrier, through its adjuster, ever said they would see [Walters] again . . . . However unfortunate it was the duty of [Walters] as held in Schaffer v. Larzelere, 410 Pa. 402 in asserting their cause of action against [Ditzler] to use all reasonable diligence to properly inform themselves of the facts and circumstances upon which the right of recovery

---

[3] In his concurring opinion in *Walker*, supra, the late Chief Justice JONES well said: ". . . the legislature can at any time, that it sees fit, reestablish an exclusion of persons under disability from the operation of the statute of limitations." (p. 152)

is based and to institute the suit within the prescribed statutory period and that mere mistake, misunderstanding or lack of knowledge is not sufficient to toll the running of the statute of limitations." *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 204 A. 2d 473 (1964), *Amrovcik v. Metropolitan Life Insurance Co.,* 119 Pa. Superior Ct. 176, 180 A. 727 (1935) and *Bodenstein's Estate,* 58 Mont. Co. L. Rep. 181 (1942), upon which Walters relies, are patently inapposite factually.

A review of this record convinces us that there is not even a scintilla of proof of any fraud, concealment or deception such as would justify the invocation of the doctrine of estoppel to toll the running of the statute. On the contrary, this record, clearly and distinctly, indicates that Walters slept on their rights and took no steps whatsoever toward the recovery of compensation for the injuries suffered by their child. They made absolutely no effort to contact the insurance company after the initial and sole visit of the adjuster. They finally contacted the insurance company approximately two and three-quarter years after the happening of the accident. Highly significant and indicative of Walters' supine negligence, lassitude and lack of diligence is the uncontradicted fact that, even after they had been notified that the insurance company could not aid them in the matter, they waited for approximately fourteen months before they instituted this action. It is indeed unfortunate that the severe injuries suffered by this child cannot be redressed; the fault however, lies not with the insurance carrier or Ditzler but with the parents of the child.

Unless the legislative mandate embodied in the statute of limitations is to be completely ignored or circumscribed by judicial subterfuge, Walters' cause of action has been irretrievably barred by their own lack of vigilance.

Judgment affirmed.

452

Dissenting Opinion by Mr. Justice Musmanno:

On July 2, 1958, Daniel J. Walters, four years of age, was playing, with other children, on a bridge which spanned the Sieglock Brook in the northern part of Lancaster County. The children would drop flowers into the brook on the upstream side of the bridge and then joyfully race to the other side of the bridge to see the flowers pass by on the bosom of the stream on its way to river which would eventually pour into the parent body of waters far away. While darting from the upstream to the downstream side of the bridge, Daniel was struck by a car being driven by A. F. Ditzler, the nominal defendant in this case.

In an instant, the carefree boy, who had been in full possession of all his faculties and in full vigor of health, became a limp and helpless mite of anatomy, destitute of physical and mental vitality. He lost the power of speech and locomotion. Young as he was, he was now pushed back into helpless babyhood. He became a floating chip of humanity on the stream of remorseless time.

A. F. Ditzler, the driver of the car, manifested utmost sympathy for the child and his parents, and visited the child in the hospital almost daily for a long period of time. He informed William B. Walters, father of young Daniel, that he carried insurance and he was sure the insurance company would take care of all bills and losses because "that's what he pays premiums for."

A month and a half after the accident, Edward Strez, adjuster for the defendant's insurance company, (Harleysville Insurance Company), called at the Walters' home, a two-story, two car garage, which had been converted into living quarters. The mother of the boy, Mrs. William Walters, asked Strez about payment of the medical bills they were incurring in the child's behalf. Strez replied he would like to have

the bills already accumulated and they were turned over to him. Mr. Walters asked Strez when the bills would be paid, and the adjuster replied that the company wouldn't pay for them "piecemeal." The payment would be made in a "lump sum settlement," and this could not be done until the matter was approved in court because "the boy is a minor." Anyhow, the adjuster explained, there could not be any immediate settlement. Settlement would have to wait until the boy was "rehabilitated."

Two days later Strez returned the bills with a note: "Mrs. Walters, I am returning the 22 bills for nursing care to Daniel. The total amount of the bills is $1104.75. Thank you. Ed Strez, adjuster."

The boy continued under constant care, receiving treatment at an establishment operated by the Lancaster County Society for Crippled Children and Adults. In April, 1960, the boy underwent an operation for his eyes. Mr. Walters was informed there might be need for another operation. A year later the parents felt the boy had reached a physical stage which would warrant discussion of settlement with the insurance company. They asked about Mr. Strez and were informed that he had left the company, his place being now taken by a Robert Dean, to whom Mrs. Walters wrote on April 17, 1961, as follows: "Dear Mr. Dean: I am writing, concerning our son, Daniel Walters, who was struck by a car driven by Archie Ditzler, Hopeland. We would like to make settlement at this time. I believe your company has a record of the private nurses' bills, as we had sent them to Mr. Ed Strez some time ago. We live on the Schoeneck-Mt. Airy road. To get to Schoeneck you turn left at the first crossroad, after you pass Ephrata on the #222. When you reach Schoeneck turn left. We live in the 7th house on the right, after you pass the Schoeneck Elementary School. You can also get in touch with us by telephone, Denver, ANdrew,

AN7-7353.   Sincerely, Mrs. William Walters R.D. #1 Stevens, Pa."

Eleven days later the insurance company replied, in effect, that it wasn't interested in the traveling directions imparted by Mrs. Walters because the case had now passed on to the road of no return.   The "Pennsylvania Statute had expired," the insurance company said.

The Walters parents knew nothing about the "Pennsylvania Statute," and were shocked by the letter.   They did not know what to do and assumed that their rights to recovery had also disappeared with the flowers their boy had dropped into the Sieglock Brook on the way to the sea.   Some time later a friend advised them to consult a lawyer, and so, in June, 1962, suit was entered against Ditzler.

After interlocutory proceedings unnecessary to discuss here, the Court of Common Pleas of Lancaster County dismissed the Complaint and the plaintiffs appealed.

This Court has affirmed the decision of the court below, stating: "Unless the legislative mandate embodied in the statute of limitations is to be completely ignored or circumscribed by judicial subterfuge, Walters' cause of action has been irretrievably barred by their own lack of vigilance."

The decision of the Majority is a punitive decision, and not merely an adjudicatory one.   It punishes Mr. and Mrs. Walters for the faith they placed in the insurance company adjuster who called at their home and said that settlement would be made in a "lump sum" when the boy was "rehabilitated."   Mr. Walters testified that he understood by "rehabilitated" "recovered."   When did Daniel recover?

As a matter of fact, he hadn't recovered even when the suit was finally filed.   The only reason Mr. Walters

entered suit when he did was that he was advised by a lawyer to do so.

The Majority makes much of the statute of limitations as if the statute of limitations is written in the sky, and if one does not look up into the air to see what is spelled out there, he cannot blame anyone but himself for the lightning of repudiation which will strike him down if he waits for more than two years after tragedy has entered his home. Walters knew nothing about the statute of limitations. He had an eighth grade education. He had five small children; he lived in a renovated garage. Neither his sociological status nor his limited studies would acquaint him with a statute of limitations.

I do not mean to say that the statute would not apply to him unless knowledge of it was actually brought home to him, but I do say that the statute is tolled when one is deceived into delaying filing of a lawsuit. The whole record in this case points to but one conclusion and that is that William Walters honestly believed that the insurance company would take care of the case and that there was nothing for him to do until the insurance company took action. The driver of the offending car, Ditzler, told him, not only shortly after the accident that the insurance company would be responsible for damages, but even at a time which happened to be subsequent to the two-year period following the accident. At no time did the insurance company inform Walters that they would not be liable until, of course, their letter of April 28, 1961.

Even the executive secretary of the Lancaster County Society for Crippled Children and Adults, where the boy was receiving treatment, informed Mr. Walters that his case was in good hands because of the intervention of the insurance company. She spoke of this a number of times. If all the weather experts in a

given area say there will be no rain, one can't be blamed for not carrying an umbrella on a sunshiny day.

There is no evidentiary support for the Majority's statement that Walters was guilty of "supine negligence, lassitude and lack of diligence." He was waiting for that blessed day of rehabilitation of which the insurance agent had advised him. It did not come and so, in spite of the fact that their boy still remained in a crib and in a wheel chair, unable to talk and no longer the lad who had dropped flowers into the creek, he had his wife inform the insurance company of the road it should follow in reaching his humble and sorrow-laden home.

While there was no duty on the part of the insurance company to inform Walters of the statute of limitations, one could assume that, having taken cognizance of the case by accepting bills and receiving a report from its agent on the case, it would advise Walters of the imminence of the expiration of the statutory period. Good business procedure does not exclude humanitarian considerations.

The Majority lays stress on the fact that Walters did not file suit for 14 months after being notified by the insurance company of its disclaimer, but culpability of neglect is not so certain here as the Majority assumes. In the first place, the insurance adjuster had led Walters to believe that the company could make no payments until there was an approval in court. Walters could well have believed that the insurance company would take the initiative. When the insurance company then informed him of its disinclination to do anything, he felt himself in a fog of bewilderment: "Q. . . . Will you tell us now why you didn't bring it to them—this matter—until June 4, 1962—almost fifteen months later? A. Well I didn't know I could do anything. Q. . . Well then what did you do about

that?  A. I didn't do anything for awhile; I didn't know what to do."

His wife was equally benumbed by the insurance company's action: "Q. Why did you wait fifteen months after you were told that you weren't going to get anything?  A. Well, we were quite shocked by the letter. We just didn't know which way to turn or what to do."

In a situation of this kind, the law is not so metallically harsh as the Majority Opinion would make it appear.  It is true, as the Majority Opinion states, that, in order to toll the statute of limitations, the aggrieved person must show fraud, deception or concealment of facts.  However, in the situation we have before us, the word "fraud" is not to be employed in its strict sense of active and malicious deception.  We stated this proposition very specifically in *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 96: "In order for the doctrine of estoppel to be applied in bar of the statute of limitations, fraud or concealment must necessarily be established.  However, *this does not mean fraud in the strictest sense encompassing an intent to deceive, but rather fraud in the broadest sense which includes an unintentional deception. . . 'It is not the intention of the party estopped but the natural effect upon the other party which gives vitality to an estoppel.'* " (Emphasis supplied)

How can any one doubt that Strez's statement to Walters would have the natural effect of persuading him to wait?  Strez said, as clear as language can make it, that the insurance company could not pay the Walter's claim until the disabled boy had been rehabilitated.  The father and mother did all that was humanly possible to see their boy made whole again, solicitously they watched and studied him at cribside, tenderly they cared for him through his operations, waiting all the time for that magical day of rehabilita-

tion which never arrived. Is justice to be denied them because they accepted at face value what the insurance company, through their agent, had said, the same insurance company which had received the premiums of Ditzler to cover just such a situation as this one? Ditzler, the Walters parents, the Lancaster Society for Crippled Children were all waiting for the insurance company to take up its responsibilities. In the meanwhile, the days and months, like the flowers Daniel had dropped in Sieglock Brook, were floating out on the sea of time. The insurance company, through passive deception, were allowing the parents of the wrecked boy, to look for the return of a ship the insurance company knew would not sail into the port of contractual fulfillment.

In the *Nesbitt* case the plaintiff did not file his complaint until 30 months after the accident. The defendant pleaded statute of limitations. The evidence revealed that the insurance company, through its agents, had talked settlement with the plaintiff. The adjuster, as is true in this case, told the plaintiff that it could not make interim payments and that only one lump sum could be paid when all the facts were ascertained. This Court, in reviewing the record in that case, said: "He [the adjuster] concealed the fact that the carrier considered the case one of nonliability. Admittedly, he did not mention the statute of limitations because before this visit he had discussed this point with a superior and was specifically instructed not to do so. He inquired of and noted the additional expenses that had been incurred. Upon leaving, he said that he would see her again and that she should phone him if anything turned up. The plaintiff was never contacted again."

Strez never communicated with the Walters family again. This Court said in the *Nesbitt* case: "If the above facts are true, and in our opinion this question

has not yet been determined, the circumstances could reasonably lead to the conclusion that the conduct of the defendant's agents caused the plaintiff to unduly relax her vigilance and delay institution of the present action to a time beyond the statutory limitation period. This would give rise to an estoppel."

Why shouldn't there be the same ruling in this case? "Equitable estoppel applies where, because of something that has been done, a party is denied the right to plead or prove an otherwise important fact: 19 Am. Jur. Estoppel §34 (1939). It is based upon the principle that ' "a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has in good faith relied thereon." ' " (*Nesbitt,* pp. 95-96)

In *Amrovcik v. Metro. Life Ins. Co.,* 119 Pa. Superior Ct. 176, the plaintiff brought an action for permanent liability benefits under two policies of insurance. The insurance company refused payments on the basis that the plaintiff had not filed proper forms. There was evidence that the plaintiff, who was illiterate, had not filed the proper forms because he was misled by the insurance company agents. In supporting the plaintiff's claim, the Superior Court said: "The appellant cannot now take advantage of the plaintiff's failure to file what it may call 'due proof,' when such failure was caused directly by the statements and actions of appellant's authorized agent. 'It is a well settled rule of law that a party to a contract cannot escape liability under his obligation on the ground that the other party has failed to perform a condition precedent to the establishment of such liability or to the maintenance of an action upon the contract, where he himself has caused that failure."

The insurance company in the case at bar should not be permitted to take advantage of a situation which it created. It should not be allowed to plead statute of limitations when its agent laid, in the bosom of the Walters family, the foundation of promise that it would undertake financial liability at a time when the slightest awareness of the facts showed conclusively that the appraisement of full financial liability was more than two years away. The insurance agent saw young Daniel in his crib and was informed by the boy's parents of the long road which lay ahead, leading to rehabilitation. The insurance company should not now be permitted to build across that road the stone wall of Repudiation.

Mr. Justice ROBERTS joins in this dissenting opinion.